[Civ. No. 429. Fourth Appellate District.—September 24, 1930.]

HENRY E. BENNETT, Respondent, v. CHARLES S. HARDY, Appellant.

Sweet, Stearns & Forward and Stearns, Luce & Forward for Appellant.

Adam Thompson, Renwick Thompson and Gordon Thompson for Respondent.

AMES, J., *pro tem.*—This is an action to recover damages for injuries resulting from a collision of two automobile trucks. It is based upon the alleged negligence of an employee of defendant in operating said truck. Defend-

ant in his answer denied negligence on his part and pleaded contributory negligence on the part of the plaintiff. The case was tried before a jury which returned a verdict in favor of the plaintiff in the sum of $15,840, and from the judgment entered thereon defendant prosecutes this appeal. Appellant first contends that the evidence is insufficient to support the verdict in that it fails to prove defendant's negligence, and that it is insufficient to prove that plaintiff was not guilty of contributory negligence. Because of this contention it will be necessary to summarize such evidence in the record as tends to support the verdict.

The accident occurred at the intersection of 25th and L Streets in the city of San Diego. L Street is a paved highway extending in an easterly and westerly direction, the roadway of which is 52 feet in width from curb to curb. Twenty-fifth Street extends in a northerly and southerly direction and intersects L Street at right angles. It has a paved roadway 60 feet in width from curb to curb. A single line of street-car track is maintained on 25th Street parallel with its curb lines, the westerly rail of which is east of the center line of said street, the east rail being 21.9 feet from the east curb line of 25th Street, and the west rail 33.4 feet from the west curb line. The plaintiff testified substantially as follows: On the morning of July 9, 1927, he was driving a light Ford truck in a westerly direction on the north half of L Street at the rate of 15 miles per hour. As he approached the intersection he retarded the speed of his car to the rate of 10 miles per hour. Upon reaching the intersection he looked to the left and right and straight ahead and did not then observe the approach of defendant's truck. His attention was not attracted to its proximity until he had crossed both rails of the street-car track and was on the west side of the center line of 25th Street. When in that position his attention was first attracted to the approaching truck of the defendant by the noise produced by the application of brakes and the skidding of tires. He then for the first time observed the defendant's truck approaching from the south, and it was then at a distance of about 20 feet from the position occupied by the plaintiff. Defendant's vehicle was a light delivery truck operated by one Ceres. Plaintiff testified that the approaching truck was being driven at that time at

"a terrific rate of speed" and was approaching the truck occupied by him. He defined the phrase "a terrific rate of speed" as a rate of speed of from 30 to 50 miles per hour, and estimated that the defendant's truck was traveling at a rate of at least 30 miles per hour. When he had traversed about three-fourths of the distance across the intersection, with the defendant's car still approaching, he turned to the right in a northwesterly direction in order to avert a collision. Upon making said turn he accelerated the speed of his truck and crashed into a pole which he designated as a telephone pole, causing the injuries complained of. At the time of his impact with the pole he estimated his speed at 20 miles per hour. Evidence subsequently introduced prove it to be the property of the San Diego Electric Railway Company, and was used to support the trolley wires of its railway system. As he swung to the right he glanced over his shoulder and observed defendant's truck still approaching and that it "seemed to tip up on the left side". The distance between the point where plaintiff turned and accelerated his speed, to the pole into which he crashed was 25 feet. He further testified that when he swung to the right, defendant's car continued to approach and proceeded upon that portion of the intersection from which plaintiff had diverted his course. He testified in this respect as follows: "And as I saw positively he was going to hit me I swung to the right; and he went right into the course of mine, more like that (illustrating); about there. And I swung to the right like that, and he just followed in the course and came right around to the curb." He again testified that when he swung to the right, Ceres kept coming, and says: "I cleared, I swung, he went over the ground I had traveled." It appears that the two trucks came in close proximity to each other, but there is no evidence in the record of an impact. Plaintiff, referring to defendant's truck, testified as follows: "It came so close that there was practically no space between us." He estimated the speed at which he was driving when he collided with the pole at about 20 or more miles per hour. The plaintiff did not apply his brakes at any time while traversing the intersection. He testified that the hand or emergency brake was in good condition, but that the foot-brake was not in as good condition as the hand-brake.

Witness Mrs. Emma Hall, who resided on L Street, in the vicinity of the intersection, was an eye-witness to the accident. She was on her front porch at the time of and before the accident occurred and observed the trucks of both parties enter the intersection. She testified that plaintiff entered the intersection first, traveling at a rate of speed estimated at 15 miles per hour, and the defendant's truck entered the intersection when the plaintiff's truck was at the car track, traveling at a rate of speed estimated at between 30 and 35 miles per hour. From the time that she first saw the defendant's car until it had completed its left turn it did not slacken its speed, but continued at that rate of speed across the intersection until the left-hand turn had been negotiated. She further testified that ''it seemed like he (Ceres) came up in the space where Mr. Bennett vacated''.

Two witnesses called on behalf of plaintiff testified that they observed skid marks on the pavement which were presumably made by defendant's truck, shortly after the accident occurred; that the skid marks began on 25th Street 5 or 6 feet from the south line of L Street, ran north through the intersecting lines for a distance of between 35 and 40 feet.

Ceres testified that plaintiff was driving his automobile down L Street at a rate of 40 miles per hour, but that he was driving his delivery truck at the rate of 15 miles per hour and slowed down upon entering the intersection and turned to the left to avoid a collision.

Clearly, the testimony of plaintiff, corroborated by that of Mrs. Hall, was sufficient to support a finding that plaintiff entered the intersection first and that he was not traveling at a rate of speed in excess of 15 miles per hour. This conclusion is further supported by proof of the condition of plaintiff's car, the windshield of which was not broken or shattered as a result of its impact with the pole. To repel the effect of this evidence appellant relied upon the testimony of his driver and other evidence which may be summarized as follows: George B. Franks, a line foreman for the San Diego Electric Railway Company, which owned the pole with which respondent's car collided, testified that he put the pole in place several years before the time of the accident; that that portion of the pole which pene-

trated the earth had been chemically treated for the purpose of arresting decay and deterioration; that on the morning of the accident it was in good condition; that he saw the pole on the morning of the accident and shortly thereafter; that the pole was broken off at its ground line and had been shattered at a point about 18 inches above the ground and that the wood was in good condition and was sound. Witness Steyle, who was called for appellant, qualified as an expert automobile mechanic and testified as to certain tests made with a Ford automobile similar in construction and design to that of the plaintiff; that the tests so made demonstrated that at a distance of 25 feet the speed of a car traveling at the rate of 10 miles per hour (which was the speed at which respondent estimated he was traveling in crossing the intersection) could be accelerated at the rate of but one and one-half miles per hour. Four structural engineers called by appellant testified as to the rate of speed at which an automobile of the model, design and weight of that driven by plaintiff would be required to break and shatter the pole as appellant contends it was broken and shattered in this case. These estimates vary from the rate of 32 to 34 miles per hour. Therefore, argues appellant, the rate of speed at which respondent was traversing the intersection must have been greatly in excess of 10 miles per hour.

Respondent attacks the testimony of appellant's witnesses with respect to the condition of the electric pole by introducing evidence which tended to prove that the pole was not completely broken off but was indented about 2 inches at a point about 18 inches above the surface of the ground and that it required a motor-truck to which the pole was attached by a cable in order to remove the same and that the pole continued in use for about one week after the accident. One of the witnesses for appellant testified on cross-examination that the portion of the pole upon which the experimental tests had been made was taken from that portion thereof which had been embedded in the ground which had been chemically treated and had not been subjected to the elements.

Appellant contends that there is no conflict in the evidence on the issue of the speed at which plaintiff was driving his car across the intersection. He argues that the evi-

dence adduced by the experts established conclusively and without contradiction that plaintiff was' operating his car at a high rate of speed in violation of the law, but it will be noted from the evidence above summarized that the premises from which this conclusion was deducted are based on evidence which is in direct conflict, and in view of this conflict we are not prepared to say that the verdict is not supported by the evidence. It is well settled in this state that the jury is not bound by the testimony of an expert. (*Linforth* v. *San Francisco G. & E. Co.*, 156 Cal. 58 [19 Ann. Cas. 1230, 103 Pac. 320]; *In re Redfield*, 116 Cal. 637 [48 Pac. 794].) And it is for the jury to determine the weight to be given the testimony of expert witnesses. (*Dunphy* v. *Dunphy*, 161 Cal. 380 [Ann. Cas. 1913B, 1230, 38 L. R. A. (N. S.) 818, 119 Pac. 512]; *Barnum* v. *Bridges*, 81 Cal. 604 [22 Pac. 924]; *May* v. *Farrell*, 94 Cal. App. 703 [271 Pac. 789].) Appellant quotes from the case of *Waizman* v. *Black*, 101 Cal. App. 610 [281 Pac. 1087], to the effect that the opinion of a nonexpert witness upon a subject about which he is admittedly unqualified to testify, does not create a conflict with the undisputed physical facts, but in that case the question involved was the speed of appellant's car, plaintiff having admitted that she was wholly unqualified to give an opinion and another witness' testimony being impeached by her own contradictory testimony. In that case the court says:

"Thus, as to the question of speed of appellant's car the plaintiff frankly admitted she was unable to testify and then guessed that it was about thirty or thirty-five, while Miss Black, when asked how fast appellant was going at the intersection answered: '*Maybe* thirty-five or forty.' If we were to consider such testimony as evidence it is certainly evidence of the weakest character which must give way to the physical facts when such facts clearly demonstrate that the estimates of the witnesses were poor guesswork."

The appellant also cites the case of *Giannini* v. *Southern Pac. Ry. Co.*, 98 Cal. App. 126 [276 Pac. 618, 622], but in that case it is said: "The opinion of an expert upon assumed facts so variant from those shown by the uncontroverted evidence cannot be given any probative force." We think that the above quotation is particularly applicable to

the instant case for the assumed facts by reason of the conflict of the testimóny as to the physical facts. The testimony of the experts in this case and the assumed facts upon which it was based were far from being conclusive. The issues were properly submitted to the jury and their verdict is binding upon us here.

 Appellant next contends that the negligence of the respondent contributed to the accident for the reason that it appears from the evidence that his brakes were not in good condition, in violation of section 94 of the California Vehicle Act (Stats. 1923, p. 545), in effect at the time of the accident. While the evidence as to the condition of respondent's brakes was conflicting, assuming, for the purpose of the argument, that they were not in effective condition to retard the speed of the car as required by law, the evidence is such that the jury could well conclude that such defective condition of the brakes was not the proximate cause of the accident. It is uncontradicted that the respondent did not apply his brakes after he entered the intersection. To the contrary he accelerated the speed of his vehicle and testified that had he not done so a collision between the two trucks would have occurred. The question as to the proximate cause of the accident rests with the jury. In *Newman* v. *E. E. Overholtzer Sons Co.*, 182 Cal. 778 [190 Pac. 175], it was said:

"As to whether or not respondents were negligent under the circumstances in stopping to avoid a collision, it is sufficient to say that the question, as to whether such conduct was negligence and, if so, was a proximate cause of the injury, was for the jury to determine.

"The proximity of one fact to another in a case, and their relation or sequence to each other, is essentially within the province of a jury to determine." (*Smith* v. *Occidental etc. Steamship Co.*, 99 Cal. 462–467 [34 Pac. 84, 85]; see, also, *Dougherty* v. *Ellingson*, 97 Cal. App. 87 [275 Pac. 456]; 19 Cal. Jur., p. 650.)

 Assuming that the evidence adduced by the respondent is true, which we are bound to assume for the purpose of supporting the verdict in this case, the rapid and unexpected approach of appellant's car toward that driven by the plaintiff requires an application of the imminent peril doctrine. We think it was a case where the plaintiff

was confronted with sudden and imminent peril, and even though he may have erred in his judgment, if he did under the circumstances what a reasonably careful and prudent person would have done under a similar situation he cannot be chargeable with contributory negligence. (*County of Alameda* v. *Tieslau*, 44 Cal. App. 332 [186 Pac. 398]; *Dobbie* v. *Pacific Gas & Elec. Co.*, 95 Cal. App. 781 [273 Pac. 630]; *McLaughlin* v. *Los Angeles Ry.*, 180 Cal. 527 [182 Pac. 44]; 19 Cal. Jur., p. 598, sec. 36; *Shupe* v. *Rodolf*, 185 Cal. 371 [197 Pac. 57]; *Hoff* v. *Los Angeles Pac. Co.*, 158 Cal. 596 [112 Pac. 53]; 19 Cal. Jur., p. 600.)

Such negligence is ordinarily a question of fact and it becomes a question of law only when the evidence is such that the court is compelled to say that it is not in conflict on the facts and that from these facts only one inference can be drawn by reasonable men, namely, an inference pointing unerringly to or against contributory negligence on the part of the plaintiff. (*Reaugh* v. *Cudahy Packing Co.*, 189 Cal. 335 [208 Pac. 125].)

The appellant next contends that the damages awarded by the jury were excessive. The jury assessed the general damages sustained by the plaintiff at $15,000, the full amount prayed for in the complaint. The injuries sustained by the respondent were as follows: His chest was badly bruised and lacerated, his kneecap broken "right in two", side of his head was cut, requiring five stitches in the scalp. Following the accident his leg became numb from a point about halfway between the knee and foot and continuing down to the toes. At the time of the trial he was still under the care of his physician and still suffered pain as the result of a broken kneecap, that the left knee is enlarged, that the knee has lost a part of its flexibility and occasionally the knee turns over while the respondent is walking and he falls, he suffers from headaches and dizziness every day or two, that his weight decreased from 150 pounds at the time of the accident to 126 pounds at the time of the trial, that he walks with a limp, that when he steps on his left foot it hurts. It further appeared from the record that he was by occupation a rancher, owning and cultivating a small ranch near the city of San Diego; that prior to the accident his work consisted in cultivating and caring for the fruit-trees upon his ranch, picking fruit, packing and

marketing the same. As a result of the accident he is unable to do a large part of his work. He testified that he could not do light work any more, that he could not climb trees for the purpose of picking the fruit and was required to hire much of his work done. He was forty-two years of age at the time of the accident and it was stipulated that his life expectancy was twenty-three years. His evidence is corroborated by that of his physician, who testified as to a complete fracture of the kneecap, that the limitation of motion of the left leg is and will remain permanent and that he will have a permanent scar on his scalp.

In the early case of *Aldrich* v. *Palmer,* 24 Cal. 513, it is said: "In actions for personal torts the law does not attempt to fix any precise rules for the admeasurement of damages, but, from the necessity of the case, leaves their assessment to the good sense and unbiased judgment of the jury. Their verdict, as in all other cases, is subject to review by the court, but it will never be disturbed unless the amount of the damages is obviously so disproportionate to the injury proved as to justify the conclusion that the verdict is not the result of the cool and dispassionate consideration of the jury. . . . Where the law furnishes no rule for the measurement of damages, their assessment is peculiarly the province of the jury, and the court will never interfere with their verdict merely on the ground of excess. Upon such a question the court has no right to substitute its opinion for that of the jury, merely because it happens to differ from theirs."

In *May* v. *Farrell,* 94 Cal. App. 703 [174 Pac. 789, 795], the court said: "It is the rule that the verdict of the jury cannot be set aside on the subject of damages unless so plainly excessive on the face of the record as to warrant the conclusion that it was the result of passion or prejudice (*Perry* v. *Angelus Hospital Assn.,* 172 Cal. 311 [156 Pac. 449]; *Anstead* v. *Pac. Gas & Elec. Co.,* 203 Cal. 634 [265 Pac. 487]). There is no absolute rule for the determining whether a verdict is excessive (*Morgan* v. *Southern Pac. Co.,* 95 Cal. 501 [30 Pac. 601]), and awards for personal injuries cannot be so held as a matter of law simply because the amount may be larger than is ordinarily allowed in such case". (*Morgan* v. *Southern Pac. Ry. Co.,* 95 Cal. 501 [30 Pac. 601]; *James* v. *Oakland Traction Co.,* 10 Cal.

App. 785 [103 Pac. 1082]; *Lynch* v. *Southern Pac. Co.*, 24 Cal. App. 108 [140 Pac. 298]).

■ While the amount of the verdict is large—larger, perhaps, than would have been awarded by this court, had the assessment of damages been our province, that alone is not a sufficient reason for disturbing the verdict. (*Morgan* v. *Southern Pac. Ry. Co.*, *supra.*)

Independent of his testimony to that effect, the jury could not escape the conclusion that respondent endured intense pain and suffering, as a result of appellant's negligence. His injuries were of a permanent character and retarded his locomotion and curtailed his physical activities. It is for the jury, in the first instance, to assess the damages sustained, subject to the supervision and correction of the trial court on a motion for a new trial. With the evidence above summarized before them, we cannot say (as we must if we find the verdict excessive), that it was the result of passion or prejudice.

The judgment is affirmed.

Cary, P. J., and Barnard, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal October 20, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 20, 1930.