[Civ. No. 3044.   Fourth Dist.   Mar. 8, 1943.]

LESLIE DOUGLASS, Respondent, v. J. S. CRABTREE, Appellant.

[Civ. No. 3045.   Fourth Dist.   Mar. 8, 1943.]

EARL DOUGLASS, Respondent, v. J. S. CRABTREE, Appellant.

Hoge, Pelton & Gunther, Chester O. Hansen and A. Dal Thomson for Appellant.

Glenn M. DeVore, William B. Johnston and Mildred Kluckhohn for Respondents.

GRIFFIN, J.—These are two actions for personal injuries which were consolidated for trial by jury and which, under stipulation of the parties and order of the court, were submitted on appeal on one set of briefs. A verdict was rendered in each case in favor of the plaintiffs. From judgments entered thereon, defendant appeals. The amount of the judgment in the Leslie Douglass case is $1,200. The judgment in the Earl Douglass case is $12,000.

The accident occurred October 15, 1938, between 8:30 and 10 o'clock in the morning. Driving conditions were normal. Leslie Douglass was the driver of a 1929 two-door Oakland sedan automobile in which he and his brother, Earl Douglass, the other plaintiff, was riding. The car belonged to Earl Douglass. They were on a duck hunting trip. Accompanying the two plaintiffs were A. S. Hawks and Leslie L. Douglass,

Jr. No appeals were taken from judgments entered in favor of the last two mentioned guests.

The accident occurred at the intersection of Elm Avenue and Central Avenue, at a point about four miles south of Fresno. Elm Avenue runs north and south, and has a paved center strip 16 feet wide. A white line divides the 16-foot center strip. The whole width of the right of way is approximately 60 feet. Elm Avenue is known as part of California State Highway No. 41. Central Avenue runs east and west and has an oiled surface center road about 13 feet wide with a seven-foot graded shoulder on each edge thereof. Immediately to the south of Central Avenue, within a distance of a few feet and running east and west and parallel to Central Avenue and crossing Elm Avenue is a large irrigation canal known as Central Canal. It is approximately 9 feet deep and 18 feet wide. A bridge on Elm Avenue crosses the large canal but at the time of the accident it was only slightly wider than the paved part of the highway. On the east side of Elm Avenue at the property line is a row of large elm trees spaced approximately 20 feet apart. There is a stop sign on the northeast corner of the intersection regulating traffic traveling westerly on Central Avenue. There is no stop sign at that intersection regulating traffic traveling on Elm Avenue. On the day of the accident the Douglass car was traveling in a southerly direction on Elm Avenue at about 20 or 25 miles per hour. The appellant Crabtree, accompanied by his wife, was driving a Chevrolet coupé westerly on Central Avenue in the immediate vicinity of Elm Avenue. As Douglass approached the intersection and when he was approximately 15 or 20 feet from the intersection, the appellant Crabtree drove into the intersection and stopped. Douglass immediately started to veer to his right off the pavement to avoid striking the defendant's car, and being unable again to return to the highway at the bridge, the car which he was driving plunged into the ditch near the west end of the bridge approximately 60 feet from the spot where he started to veer, causing severe injuries to himself and his brother. There were skid marks in the intersection, extending parallel with Central Avenue and, according to the testimony of one witness, the appellant admitted they were the skid marks of his car. These marks extended across the painted center line of Elm Avenue a distance of 8 to 10 inches and were 4 paces long. There were marks of the tires

of a car on Elm Avenue commencing at a point north of the intersection, which point was approximately 60 to 65 feet from the edge of the ditch into which the car plunged. These marks extended to the place where the car stopped. According to the testimony of a traffic officer, they were not brake marks but were made by a car swerving. The cars did not come in contact with each other at the time. It is respondents' contention that the appellant did not stop at the stop sign.

Leslie Douglass testified that as he approched the intersection he saw two cars, one to his right and one to his left adjacent to the intersection when he was 150 feet back from the intersection; that the car on his right was 150 to 200 feet back and the car on his left was 115 feet back from the intersection; that there was a eucalyptus thicket to his left about 115 feet from the intersection; that when appellant came from behind that, he saw him for the first time; that he kept watching both cars; that when he saw the car on the right was stopped he noticed that Crabtree's car was still traveling; that when he (Douglass) got within 10 or 15 feet of the intersection Crabtree's car shot out into the highway and that he cut sharply to the right to avoid hitting appellant; and that he (Douglass) did not apply his brakes at any time during the incident.

Appellant Crabtree testified that as he approached the intersection he saw the other car coming about 50 or 60 yards away; that he stopped with his right front wheel even with the stop sign; that he could not see more than 100 feet north on Elm Avenue; that he then proceeded out into Elm Avenue about the length of his car and stopped again to look, which stop took him approximately to the edge of the pavement, at which time the Douglass car swerved past him and went into the ditch; that he then proceeded across the middle of the road and stopped again, where the brake marks of his car showed; that from there he proceeded across Elm Avenue and stopped on the north side of Central Avenue.

One witness for appellant testified that about 30 days after the accident he examined the brakes of the Douglass car at a garage where it had been towed due to its demolished condition; that he found the "brake lining was worn down very thin"; that the rivets holding the lining to the brake shoes were scoring the drums on all four wheels; that the brake

and mechanism was rusty and not working freely; that there was no braking power on the two rear wheels; that the effect was to cause the car to pull to the right when the brakes were applied.

In reply, Leslie Douglass testified that he had used the brakes at intersections before he came to the scene of the accident and that at the scene of the accident he did not use his brakes; that on occasions where he stopped before the accident the brakes "stopped even." Earl Douglass testified that the "brakes were in good condition" before the accident; that he had the brakes "taken up a few days before this trip" at a garage. A brake expert, called by respondents, testified that about the first part of October he serviced the Douglass car, tuned the motor and "adjusted the brakes and lubricated and changed the oil"; that at that time they were in "good, serviceable condition" and the brake bands were not then in need of change but that he did not take the wheels off; that he drove it a short distance and they were adjusted properly and were "O.K."; that from the condition of the car after the accident, neither he nor anyone else could have told at that time what effect the rods or cables would have had on the brakes or how the brakes were working or whether the car would pull to the left or right on application of the brakes, due to its demolished condition.

Leslie Douglass further testified that right after the accident he asked appellant why he came through the stop sign and that appellant replied: "I didn't see you." On cross-examination appellant was asked if he did not tell certain witnesses that he had run through the stop sign, to which question he replied: "I don't remember." Appellant told a deputy sheriff, after the accident, that "he didn't see the man coming. " One witness testified that appellant signed a written statement reciting that "he didn't see the car at all until the car was right up to him." It is appellant's contention that the evidence conclusively shows that respondents were guilty of contributory negligence as a matter of law. We see no merit to this contention. The testimony was in some instances conflicting. However, the jury resolved the conflict in favor of the respondents on that issue and under proper instructions. Under such circumstances we cannot disturb its finding on the question. (*Fischer* v. *Davis Standard Bread Co.*, 134 Cal.App. 1 [24 P.2d 538]; *Bennett* v. *Hardy,*

108 Cal.App. 473 [291 P. 903].) The negligence of appellant has been fully demonstrated.

■ The next point raised involves a confusion in the wording of two instructions given on the question whether the contributory negligence of the driver of the Douglass car would or could be imputed to the owner where the owner was riding with the driver at the time. (Sec. 402, subd. (a) Veh. Code.) In view of the finding of the jury that the driver was not guilty of any contributory negligence and the fact that that finding has been here sustained, the point is of no consequence because there was no contributory negligence to impute to the owner.

■ There is no merit to appellant's complaint that the court erroneously instructed the jury that it might take into consideration, in determining the rate of speed the defendant was driving, as one of the circumstances, the length of any skid marks made by his car. This instruction was proper. (*Carrisosa* v. *Southern Service Co.*, 128 Cal.App. 160 [16 P.2d 1032]; *Seperman* v. *Lyon Fire Proof Storage Co.*, 97 Cal.App. 654 [275 P. 980].)

■ The last question raised involves the sufficiency of the evidence to support the judgment against appellant in the sum of $12,000 and in favor of respondent Earl Douglass. The evidence on this subject, as described by him, is that he was thrown through the top of the car and had a broken leg above the knee, a broken right hand, a place gouged out of his forehead across his temple and across his cheek; also, that he had a cut running into his left eyebrow which required eleven stitches, a cut on the right side of his chin, and a puncture on the back of his head; that at the time of trial, November 17, 1941, more than three years after the accident, his leg was still stiff and about three or four inches shorter than the other; and that he could bend it only about 85 degrees; that he was unconscious for three days after going to the hospital. He testified that he was "put in traction"; that he was in the hospital about six months and that it was eight months before he was able to get up; that he was then on crutches for one year; that he was a truck driver, employed at $140 per month at the time; that he could no longer work as such, due to his permanently impaired leg condition.

The main argument advanced by counsel for appellant before this court on the question whether the verdict was ex-

cessive was to the effect that because the injured person was drawing so near to the end of life, the impairment of his usefulness will be short and the amount of damage allowed is over-compensation. When inquiry was made as to his age, counsel announced that it was approximately 45 or 46 years. Such a conclusion does not very forcefully appeal to those of us who have reached the age suggested, and who are unwilling to admit that we are more or less "living on borrowed time." This contention is without merit, and the judgment cannot be held to be excessive. (*Bennett* v. *Hardy, supra.*)

Judgments affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied April 6, 1943, and appellant's petition for a hearing by the Supreme Court was denied May 6, 1943.